Sanchez v. Young County, Texas, we'll hear from Mr. Cleveland.  Thank you, Your Honor, and good morning. May it please the court. My name is Joe Cleveland, and I represent the estate and family of Diane Lee Simpson, a pretrial detainee who died from drug overdose due to the failure of the Young County Jail to screen and monitor Simpson's serious medical needs during the eight hour period. She was in custody and denied the freedom to act on her own behalf and seek emergency medical attention with the help of her family. That failure was not an unintended error. Let me ask you a quick question. How far away was her home from the Young County Jail? I believe it was 75 miles, Your Honor. 75 miles? Okay. That failure was not an unintended error, but the predictable result of county policies that denied Simpson adequate screening, monitoring, and care of her serious medical needs. Like Orange County, Young County had a policy of observation only, which the sheriff, the policymaker, testified he knew about and endorsed. The sheriff testified that for detainees who suffer mental disability or constitute a suicide risk, he testified that jailers conduct, quote, just observation basically is what they do, close quote. That's at the record at 349. Speaking of just observation, I can't remember the man's name. He came on around midnight and was taken back to the cell Mrs. Simpson was in to look at her through the glass window after you opened the metal covering. Was he coming on to become the next officer on shift or was he just visiting? I've seen two different references to that. What was his name, Wackaker or something? Wackaster. Wackaster. And the record does not indicate whether he was coming on shift or not. The other officer, there was a police officer there as well, Officer Post, and Officer Post was a city employee. He asked Officer Post to follow him back to the holding area where Mrs. Simpson was. Post asked Wackaster to follow him back. Wackaster asked Mr. Post to come back there. Wackaster was the sheriff jailer employee and Post was the city police officer who was there bringing some other detainees into the prison around 1215 that evening. All right. And was it Wackaster that was later convicted of something about some inmate? Yes, Your Honor. All right. But you don't know if Wackaster was actually on duty. Wackaster was on duty. You asked if he had just come on duty. The record does not indicate that, Your Honor. All right. So going back to the policy of just observation, there's other evidence in the record to suggest that was the policy because the sheriff testified that, quote, they physically, no, sir, they don't, it's through a window when he was asked if they go into the cell. Jailer Rich likewise testified that, quote, we check inmates every 25 minutes as required by Yonge County rules for jailers. That's at the record at 153. Jailer Rich referred to it as a cell check. Thus, the county had an established policy of cell checks only and merely observed detainees indirectly through a cell window regardless of the detainee's medical condition. And this is fully set forth in our brief at pages 39 to 41, 55 to 56. But why is this an observation only case? Because the plaintiff has to prove a policy that was implemented by the county to prove municipal liability. So you're not relying on the deliberate indifference theory? No. Just on conditions of confinement? No, Your Honor. Those are alternative theories. We're relying on both conditions of confinement and episodic. But you have to prove a condition on both. Well, I don't think that observation only is necessarily a policy of deliberate indifference. It depends on the condition of the patient, doesn't it? Yes, Your Honor, it does. All right. And you go to some lengths in your chart here to compare this with the recently decided Montana case. You say jail. Oh, it was prepared by the other side? It was prepared by me. By them? By me. It was prepared by me. Yeah, that's what I thought. Okay. So what was known from Simpson's arrest report? Simpson was suicidal. She denied she was suicidal repeatedly, did she not? She denied that she was suicidal, but the police officer indicated in his arrest report that she was a risk to herself. And they did, yes, but then admitted to ingesting a mix of alcohol and at least 24 capsules of seven different drugs. Well, that's not completely true because she told the jailer, as opposed to the arresting officer, is either the jailer or the EMT fellows that she'd only had two Benadryl, right? She told the EMT fellows that she had two Benadryl, but the point of the matter is that the county did not know that. Of course they did. They knew she was, they knew she had, they thought she was intoxicated for some reason. Yes. And it was, and her husband kept calling and what her husband said was she's threatened to commit suicide, but he couldn't even drive 75 miles to look at her himself. And the county said, well, we think she's just drunk, right? Or intoxicated in some way. That's correct, Your Honor. But he didn't say that she told me she was going to check into a motel and take a bunch of pills. He never told them that, at least as I read the briefs. He told them that she was going to take pills. Yes, he did. Well, I didn't see that in your briefs. That's in the brief and in the record. He told the county that or the city? He told the jailer that she was going to take pills. Okay. Well, if you can give us a record site for that, I would appreciate it. But, because it looked to me as if the woman is clearly, you know, intoxicated and maybe not able to take care of herself, but she's walking by herself at critical moments. She answers all the questions on the intake form, even though the intake form didn't have where the officer put in his comments and so on. So how do you respond to all that? Well, she answered the intake form that she was pregnant. The what? She answered in the intake form that she was pregnant. She was a 50-year-old woman with no uterus. She answered in the intake form that she. Well, they didn't know she had no uterus. But that's the way she answered that. I'm just saying that that's a level of confusion that she was operating under at the time. And you're right. They did not know that. But they certainly knew what was reflected in the arrest report, that she had trouble walking, not 20 minutes before she entered the jail. She was talking incoherently. She had slurred speech. But people who OD are probably like that all the time, or people, they did screen her for diabetes, but somebody may be going into diabetic problems that way. And that doesn't show risk of overdose and suicide necessarily, does it? Otherwise, wouldn't they have to take every drunk to the hospital and get their stomach pumped? No. Why not? Because if you look at the arrest report, it was reflected on there what she admitted that she took. And it reflected, as you indicated earlier, 24 pills of seven different prescription drugs. They had no other indication that she didn't take those. And she admitted that she took them. I mean, a lot of people have empty blister packs that they don't throw away. True. But she admitted in the police report that she took all of them that were missing that morning. How was the police report? I know the jail had that police report. Walk us through the process where they bring her in. She's being brought in basically for home protection. Correct. And they, what does the record show? They handed the arrest report to this Officer Rich? I think the arrest report was prepared at the jail. I think that's what the record reflects because he brought in the bag of pills into the jail to prepare that arrest report and the bookend report. It's basically identical to the arrest report. So there's some indication in the record that that was prepared. Gave that to Officer Rich or whatever the title was. Well. The man that was doing the booking in. You can't decipher the signature on the arrest report of who at the jail signed that. Signed the arrest report? Signed the arrest report. Okay. So basically what's on the arrest report is what the county knew. And the county knew that she'd taken all this medication, that she had incoherent speech, she had slurred speech, that she was falling down. And because they had her in custody, as you indicated earlier, for owner protection, they had a duty to take care of her. So what's the, exactly what's the policy? You're saying they should have supervised more? No, I think. What's the policy that led to this tragedy? Well, there are three, actually. There's one established policy and two de facto policies. The established policy was an observation only for inmates with serious medical needs through the window. This was not readily observed. Doesn't that depend on someone recognizing an individual jailer, recognizing she had serious medical needs? Yes. Because even if there were this policy that we're going to observe more often, no one recognized she had a serious medical need.  Because they should have recognized based on the arrest report that she needed to be observed more closely and frequently. And that was one. That seems to come back more to an act or episodic act claim. But what are your other? That was the one established policy with two de facto policies. The two de facto policies were, one, they did not run a CCQ query on her to determine what her previous hospitalizations were. She'd been hospitalized in January of that year for suicide. And that would have clarified for them the inaccuracies that were in the intake form that she told them. The second thing that was a de facto, and that was a de facto policy because that was the sheriff testified in his deposition that he didn't know that was required by state law. And he'd been the sheriff since 2010, and he said that didn't even, he didn't know that until 2015. The other policy that the county was found noncompliant for, a de facto policy, was the failure to fully complete the screening forms. And those forms are extremely important because they communicate to other jail staffers what is going on with this person. Well, that seems to be your best evidence that there actually was a de facto policy. But, again, how would filling out the bottom of the form, which is the jailer's observations, how would that have changed anything? Because they all said when she checked in she seemed to be walking fine and coherent. Well, I think that the entirety of the form would require that the arresting officer, the top part of the form requires the arresting officer indicate what her status was on intake. And if they properly put in what their status was, that she was at risk to herself, I think that would alert jail staff that she needed to be monitored more frequently for this drug overdose situation. The other thing that What's the evidence that the police officer would have said she's at risk to herself? Because he's out at the vehicle and the paramedic or the EM says she's fine, we don't need to take her to the hospital. So what's your evidence that if they had asked all these questions The paramedics did not say she was fine, she didn't need to go to the hospital. Well, the paramedic, I know there's a lot of, the paramedic did not say she needs to go to the hospital, right? I mean, excuse me, sir, but if, who, are the cops supposed to know more than the paramedics? No, no, no, certainly not. And she told the paramedics that she'd only taken two Benadryl. She told the paramedics she took two Benadryl, but she later told They checked her vital signs, I mean, what did, there's no argument whatsoever that they did anything that was deliberately indifferent or even negligent. What the, what she told the police officer was that she took 24 pills. And the police officer told, sorry my time's up, but the police officer told You've got two minutes. I'm sorry, the police officer told the jail staff that she was a risk to herself. This two Benadryls, this was in the incident report that wasn't even available to the jail? That's correct, that's correct. And so the, so what the jail knew, the jail staff knew when they took her in was that the police officer had taken her in for the protection of her, that she'd taken 24 pills with alcohol. But again, you know, she, she answers these questions. I mean, what you're really arguing for is a policy that the person who arrests her has to be physically present at the jail when the arrestee answers the questions in order to say whether those answers are consistent with the arrest report. No, I'm just, I'm just saying that the person ought to look at the arrest report and see if this person is telling the truth. But as you know, that, I mean, that's paperwork, is it not? I mean, sometimes you can't fill out the whole arrest report that quickly. But in the facts and circumstances of this case stand on their own. I mean, she had a. Then it's not a conditions of confinement case if the facts stand on their own. I'm talking about the facts of what she, what she presented with. And she presented with a person that was attempting suicide. And if they'd run the C.C.Q. on her, they would have determined that what she said in that, in her interview was entirely inaccurate. And the reason she was, it was, she was trying to commit, she was trying to kill herself. So she was lying to the, to the intake person about what her status was. But if they'd run the C.C.Q. She told, actually, she told the paramedic she didn't want to kill herself. She told the officer she didn't want to kill herself. But I don't think anybody in their right mind would believe somebody when they took 24 pills. I mean, to be honest with you, I don't understand why her husband couldn't drive 75 miles to haul her out knowing what he knew. I mean, that's just. But he told the, he told the sheriff's department, Your Honor, that she had taken pills and he told her that she was suicidal. Well, I'll read that. I mean, I know he said suicidal, yes. But let me ask you a question. Here's this arrest, I mean, this intake form. And, you know, they ask are there any current medical problems? Yes, peptic ulcer. Are you pregnant? Yes. Medications? No. Have you ever received serious mental health services? No. Do you receive a Social Security check? No. Have you had special ed? No. Do you have previous military service? I mean, this is a whole wide range of questions. And it seems to me she was coherent to answer these questions or else the jailor's not telling the truth. Again, she was a 50-year-old woman and said she was pregnant. Well, that may be true. That could show that she was drunk or ideating or something, but it doesn't show suicidal. No, it does not. And it doesn't even necessarily show a level of intoxication that's intolerable. No, but I think that's. . . Not that I know about drug overdoses, but I guess I know maybe. . . I probably know less than the jailor does. But that's the reason for that, and I don't know if my time is up, is that the intake form was not completed in its entirety as required by State law. Thank you, Your Honor. I'll proceed if my time is up. All right, thank you. Okay, Mr. Weiland. Mr. Weiland, you suggest in district court that episodic acts are the only theory upon which you can proceed for a situation of this type where a prisoner, a pretrial detainee, dies in a cell. That was the holding by the district court. Did you suggest that in district court? Yes, especially, Your Honor, based on the total absence of any facts that would support a condition of a confinement claim. No, that wasn't what the district court held. It said, situation of this type, death of a pretrial detainee in a jail, you proceed only under episodic acts, which, of course, is totally erroneous. Did you suggest that in district court? Well, we said suicide cases, in our opinion, based on our research, are always treated as episodic act cases. This wasn't a suicide case. She didn't commit suicide in the jail. She committed suicide when she took those pills hours before she was arrested. Well, we saw it as an episodic act, clearly an episodic act case, Judge. And are you the person that wrote this in the brief and the summary of the argument? In this case, appellants seek to hold the county liable because its jailers fail to act as doctors and psychologists. Page 23 of your brief. Yes, me and my team actually wrote that. Yes. Even on suicide case, the classic suicide case where the suicide happens in a jail cell, I mean, it doesn't matter what the event actually is. It doesn't matter what the lawyer is alleging. I mean, you could have a suicide committed in the jail cell, and someone's attacking a policy of not taking sharp objects out of jail cells. That would be a condition of confinement case, wouldn't it? Yes, it would. Even though it's a suicide. I think it would, yes. So what matters is what's being challenged by the plaintiff, particular acts of individuals or conditions. It does. And if you look at the complaint in the case, it was a petition which we removed to Federal court. The State petition complained in the most simplistic terms that there was a condition here of lack of medical care. Lack of medical care. That's what they started the case with. Lack of medical what? Medical care. Medical care. It certainly appears to be that. Well, and I'd like to follow Judge Jones's admonition when you came on the bench and talk about what's in the record, because this case I believe the record has been seriously misstated or misinterpreted by the appellants. And I'd like to talk about some of those things, Judge. First of all, your early question about this individual named Waycaster. Waycaster was not a jailer. That sheriff testified in his. What was he? He was a deputy sheriff there in the middle of the night to drop off a prisoner, as was the city police. They just invited him on back to go look at this woman lying undressed in the cell? Yes. He had some purient interest, apparently, of wanting to look in the women's detox. And that was a wrong thing for him to do. Eventually he was fired by the sheriff and he's been prosecuted for something completely different. But he was a jailer. Who took him back to the cell to satisfy his purient interest? Well, for some reason, the arresting officers in that case were back in the cell block. They had brought their prisoners back. And the record reflects the city policeman's report is a simple one-paragraph thing at page 515 of the record, where he was back delivering a prisoner in the middle of the night on Sunday, Monday, and Waycaster apparently was doing the same. Waycaster made this observation. They go to a leap of faith in their argument and say Waycaster was observing her for hours and knew she was in a coma. There's no record of that in the case. And the Court has to understand a threshold issue here. Well, then who was examining her other than Waycaster going back and opening the metal covering of the window to look at this partially dressed woman? Officer Rich was a woman, officer, had processed her, interviewed her, and put her in the cell. She never went inside the cell until she went in there at 210 in the morning to complete the booking in, correct? That's not – that is not correct, Judge. In her declaration, she said – That was two years after the arrest. She didn't indicate on the booking – on the periodic 25-minute form that she opened the door. Wasn't there an electronic system that if you opened the door, it registered? There is an electronic system of checking prisoners. It's on the outside of the cell. And, Judge, this is a critical threshold issue that I've been trying to address. This case, there was almost no discovery in this case. The trial lawyers, not this fellow, took no depositions. The jailers were not deposed. The arresting officers were not deposed. The Texas Ranger who conducted the investigation was not deposed. The jail standards woman who was the investigator was not deposed. They filed no requests for production of documents. They've asked for no interrogatories. This explains, while the record in this case is so minimal, that half of the things they talk about that are evidence are not in the record. Give me an example. Well, for example, the question you just asked about the log-in forms. They make a blanket statement, I believe it's in the reply brief, that there were no log-in forms. There was no log-in checks. I have the log-in checks right here in the courtroom. The reason they don't know is they never asked. They never asked for any documents from us. I think they did an open records request to the city and obtained the ---- Well, they took the sheriff's deposition, didn't they? Well, they took the sheriff's. He admitted time and time again he wasn't familiar with several policies that should have been implemented. What he said, and mostly, their own brief said he was vague. He said, I delegate the jail issues to my jail staff, my chief jailer, and I'm not familiar with a lot of the details. So they don't have a conditions case here based on any policy that we, unconstitutional policy that we promulgated or that would be de facto. How about not taking the check, doing the CCQ check? Okay. Let's talk about it. There's no evidence that a CCQ check was not run. The sheriff testified in his deposition. He wasn't sure. But what is a CCQ check? They never explained that. That's right. A CCQ check is something that you can go on a database and find out if this person who you're interviewing, who's probably under the influence, has ever been in a state mental facility. That's all it tells you, a state mental facility. There's no evidence in the record she was ever in a state mental facility. That's mandated by some Texas commission on jails or something? The Texas commission has required jailers to do that. We don't know if it was done in this case. There's no record whether they did or didn't. But if they did, there is a record that it wouldn't have shown anything. Another misrepresentation of the record, they claimed she was hospitalized for suicide in 2013. The citation that they used for that authority is testimony of the husband who said she was in drug rehab for three days in 2012. He just indicated to you that the city policeman, Ford, told the jail staff that she had taken all these drugs. There's no record of that. There's no record of Ford. There's the arrest report. Is that in the arrest report? It's in the arrest report. Who prepared the arrest report? Officer Ford. Exactly. Okay. And the jailers had it. Some jailers signed it. Some jailers. We don't know which one because it's not in the record. It's certainly not in the record that Ms. Rich ever saw that report. But even if she did, the report says this woman was just examined by the EMT out on the roadside. These jailers are not doctors. They bring in this inebriated woman who says, I'm not suicidal. And the jailers know she's just been checked by the medics on the side of the road. They put her in the detox. And in this case, not like your case in Montano, she was only there for a matter of hours before she passed. It was a very regrettable situation. But this jail, by the way, this is also in the record, is among the top 25 in terms of incarcerations per capita of any county in Texas. There's 252 counties, I think, in Texas. Why is that? Apparently, there's a lot of bad actors in Young County, Texas. Well, I mean, is this sort of northwest of Austin? It's northwest of Fort Worth, Judge. Out in the country, it's west of Jacksboro, west of Decatur. So it's out there in ranch country. So they do the best they can with a high school-educated jailer, although that's not in the record either. So I don't mean to wander away from the record. Simpson advised that her husband did it because she left him. I mean, you know, I observed that her speech was slurred. She was slow on her answers and talking real quiet. Yes. Simpson advised that she had something to drink last night to help her to sleep. And that's what the arresting officer, and then he says, I found that 12 empty capsules. I located an individual capsule. I went and asked Simpson how much of the medicine she had taken, all of it that was missing this morning. I asked if she was trying to hurt herself. She advised no. So we know now, and Judge, you pointed out, that the longer-form incident report was not available to anyone until after she died. But we know now that she also told the officer that she had taken no drugs. At least twice she told him that out on the street. And I think one of the great fallacies of the case is this magic statement that they attribute to her, and I don't doubt that she said it. But it had to do with, I took all the drugs that are missing this morning. She didn't explain what was missing the night before or the day before. But again, it's irrelevant. The policy Young County has, there's these five types of conditions where they won't admit an inmate without a physician examination. One of them is high levels of alcohol intoxication. Drug overdoses is not on that. Isn't that a policy that helped lead to this, by not having physicians examine people who might be subject to drug overdosing? Certainly, if you start to have physicians examine everyone who's brought into the jail, I suppose you could adopt a requirement. I mean, why does it make sense to have a physician examine someone who's drunk, but not someone who's had a drug overdose? Well, if it's alcohol, the arresting officer can give her a breathalyzer test. And if the officer then brings her in and her breath test shows that she has a high elevation of alcohol, they can refuse her at that point. And have a physician examine, I thought is what the policy said. Well, they have a physician on call, and they have a rate. So why not include drug overdoses with high levels of alcohol intoxication? Yes. I suppose you could require that. I mean, on conditions of confinement, one of the elements is what's reasonable. It just doesn't seem like there's a distinction. Yes. And again, they never created any kind of a record. They constructed a record like the plaintiff's did. I understand that when she was arrested, she was asked if she wanted to go to a hospital. Where is that in the record? Is that in the arrest report? I believe it is in the arrest report, Your Honor. And she was asked if you want to go to the hospital, and she said no because do I have to go to the jail after that? And they said yes. So we also know that at least the person that arrested her thought perhaps it was necessary for her to go to a hospital. Well, they had the EMT there to second-guess them on that. And I'm sure the arresting officer felt like if the EMT was going to allow this woman to go to the jail, there was no danger. So it's a genuine dispute of material fact in a sense. Pardon me? A genuine dispute of material fact. We're here on a summary judgment. We're not here on a trial record. Right. I mean, to me, frankly, we've just got multiple genuine disputes of material fact that perhaps need to be tried. Well, I don't see the disputes of fact, Judge, because there's no record made by the plaintiffs in the case that would support the conclusion that any fact that they're arguing about is really material. What would be the material fact or how material is it that the little observation section of the screening form was not filled out in this case? Well, we know that the jailer was, and indeed the arresting officer, reported her mobility and her ability to answer questions. If the jailer had written, seems inebriated, as her observation, that wouldn't change the facts or anything. There's nothing in the record that they tried to create or didn't try to create in the district court that established any material facts that were in dispute. I haven't seen one material fact that's in dispute in the case. So you're saying that where they're, this plaintiff's counsel cited three policies. One is the intake form not being completed. One is the CCQ not being run. And the third one is supposed observation only policy for inmates with serious medical needs. And what's your, why is there no material fact on that issue? Well, they didn't, I mean, that is a new, to me, that's a new theory that they've come up with on appeal. That was based on Montano, right? That, yes. Montano has led them to believe, let's talk about observation. So it's not our duty to create policies or lack of policy when we don't have record evidence? I would certainly say that. And it's not my duty, it's not my duty to argue the opposite side of the case to Judge O'Connor. We waited until the discovery deadline had expired. We filed a motion for summary judgment. Now, in the district court, they did talk about lack of medical as a condition of confinement. And there were some allusions to training. But there's no, there's no record here. And of course, you've got several cases about one-off instances of lack of training not amounting to a condition of confinement. To me, Judge Barstow, this case is in the mainstream of cases like the Hyatt case that was decided here on November 18th in the estate of Allison v. Wansley, a 2013 case. Hyatt is the instance of where the person committed suicide in the jail, correct? That was handed down about last week or so? It was Hyatt was November the 18th, Judge, yes. That's where the person committed suicide in the jail using a plastic bag or something? Yes. And they checked in. And when they checked in, the gaoler was told and wrote down that the detainee had consumed a half a bottle of vodka and Xanax. And then, and also had attempted suicide two months before. Now, the court found that they still had qualified immunity because the gaoler did some things. I'm not talking about qualified immunity here. There's a vastly different standard, as you know. Well, it's a different standard for sure. But in terms of deliberate indifference and what was happening at the scene of the jail. Deliberate indifference isn't required for unconstitutional conditions of confinement. Let me ask you a question. Did, when her husband, I was looking, I thought, reading the briefs pretty closely, and I did not see a record cite to the fact that her husband told them that she was going to ingest a bunch of pills. The husband said during his deposition that he was afraid that she would try to commit suicide. That's what he said on the phone to the city. He said he said that to the city. And then later he said it to a jailer. He was afraid she would try to commit suicide. He didn't say that he knew that she had taken anything, which Judge O'Connor thought was important. And he also testified in his deposition that he knew the EMT had been out examining her because the jail knew it and told him, don't worry, the EMT is out there. So when it came to the consideration of the case, I think Judge O'Connor felt like, my gosh, this woman was just examined by medics and the jail knew that when they brought her in. She insisted that she was not trying to commit suicide, and they put her in the cell. So I don't think there are any material facts in dispute that would give rise to liability on the part of the county. All right, sir. Thank you. Okay, Mr. Cleveland. To answer your question, Judge Jones, on page 27 and 28 of our brief, Mr. Simpson specifically informed the jailer that Ms. Simpson had threatened, quote, that she was going to take drugs, close quote. That's at the record at 235 and 259. Mr. Simpson told him that, quote, I want to make sure that she's safe, that she's okay, close quote, and implored the jailer to, quote, please get her some help, close quote. That's at 235 to 236 and the record at 259. How about addressing the claim by counsel opposite that you are misstating the record and that the record is totally incomplete? Well, this is a summary judgment proceeding. I've tried to carefully cite to every portion of the record and quote exactly what the record said, and I was very careful in that. So, you know, I was not the trial counsel involved. I'm just the appellate lawyer, and the record is about this thick, and so it's pretty easy to flip through. It's not that significant of a record. So, you know, I think that the record speaks for itself, and I think he mentioned this case of the estate of Allison v. Wensley. This is an episodic case where the woman came in with significant alcohol intoxication, and in that case the jailers did frequent monitoring to ensure that she was still breathing, attempted to rouse her, allowed her to speak with her husband, and went in to help her take the medication that she needed. And in that case the Fifth Circuit said there's no evidence that there was any overdose on pills, but the Fifth Circuit held that it was objectively reasonable for the jailers to allow the intoxicated inmate to sleep it off with periodic monitoring to safeguard her well-being. And that's what was completely absent from this case. There was zero monitoring. Well, but the policy said every 25 minutes you need to monitor. I'm not talking about... You're saying they weren't following that policy. No, I'm not saying that at all, Your Honor. I'm saying they did not go inside the jail to assess her condition. But he says there's evidence about that, and the trial counsel didn't bother to get the evidence. I don't know what evidence he's referring to. The evidence that they did not conduct monitoring. I'm saying that there is no evidence in the record that anyone entered her cell. There is a two-page affidavit. That's not their burden. It's your burden. In summary judgment, they have to prove no genuine issue of material fact, and there's a genuine issue for trial.  But you have the burden to establish a fact question that nobody entered her cell and did an observation. That's correct, Your Honor. And there's no evidence in the record that that ever occurred. There is evidence in the record that Ms. Rich testified in a two-page affidavit that checks were made every 25 minutes. But it doesn't say that she actually entered the cell or it was just checked with the window check. And this argument was made below? Yes, Your Honor. Where is it discussed in Judge O'Connor's order? About the window checks? No, a policy of no observation or a policy of insufficient observation. In his order, I don't know. Okay. Well, that may be because of episodic business. But, I mean, you articulated three policies to us earlier. And one was the intake form, one was the CCQ, and the third was observation only. Right. And that's in our brief at pages 39 to 41, 55 to 56, pages 18, 22, and 26. But where did you argue that in the district court? I can't point, as I seated her today, to the exact place in the summary judgment motions where that was argued. Okay. But not to suggest it's not there, I just can't right now. Right. Well, maybe you can find that for us at some point and give us an update or something. Let me just also talk about why this should not be classified as solely an episodic case. This is not an isolated instance of inadequate medical care. And there is no single individual's error that caused the harm. You've got the unknown officer that took the intake form and didn't communicate what was on the intake form apparently to other people. You've got the arrest report. You've got Officer Rich failing to fully complete the intake. You've got the jailers who did not actually go in frequently and closely monitor to see what her physical condition was during the course of her stay at that jail. So there was a systematic and pervasive deficiencies in screening and monitoring. I don't think you need to persuade us that this is a possibility. I think what we've been talking about is whether there's any evidence to support a conditions of confinement claim. Well, in this case, the conditions themselves were the result of the policies that are articulated were the cause of the harm. If they had a policy that said you have to go into the jail cell to go look at somebody that was suffering from severe illness such as drug detox or somebody that was on drug overdose, that would be one thing. If you had a policy that said no, the prison officials are not allowed to make incomplete intake forms or a policy to run all CCQs, then that would be something else. Okay. Thank you, Your Honor, very much. Appreciate it. Thank you. All right. Final case on argument this morning is number 15-3114.